Michael A. Sirignano
Barry I. Levy
Priscilla Kam
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees
Insurance Company, GEICO Indemnity Company,
GEICO General Insurance Company and
GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

Docket No.: _____( )

                Plaintiffs,

        -against-

LORRAINE PHARMACY INC., RODSHAL
YAKUBOV and JOHN DOE DEFENDANTS "1"
THROUGH "5"

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Lorraine Pharmacy Inc., Rodshal

Yakubov, and John Doe Defendants 1 through 5 (collectively, "Defendants"), hereby allege as

follows:

1.      This action seeks to terminate a large, on-going fraudulent scheme perpetrated by the Defendants who exploited the New York "No-Fault" insurance system by submitting more than $748,700.00 in fraudulent pharmaceutical billing to GEICO involving *just eight days of service*. Defendants Lorraine Pharmacy Inc. ("Lorraine Pharmacy") and Rodshal Yakubov ("Yakubov"), along with John Doe Defendants "1" through "5" (collectively, the "Defendants"), purportedly dispensed the Fraudulent Pharmaceuticals to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds").

2.      Specifically, the Defendants submitted, or caused to be submitted, hundreds of fraudulent claims to GEICO in "quick-hit fashion" seeking payment for a set of specifically targeted medically unnecessary "pain relieving" topical prescription drug products, almost exclusively in the form of topical Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment (collectively, the "Fraudulent Topical Pain Products"), as well certain other medications including oral nonsteroidal anti-inflammatories ("NSAIDs") and muscle relaxers (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").  The Defendants operated Lorraine Pharmacy solely for the purpose of fraud, abruptly shutting down active pharmacy operations after a short burst of fraudulent billing, but then pursuing collection on the fraudulent billing from GEICO (and other New York automobile insurers) through hundreds of individual collection proceedings after the closure of the pharmacy.

3.      As part of the fraudulent scheme, the Defendants engaged in illegal, collusive agreements with various prescribing healthcare providers (the "Prescribers") and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics").  Pursuant

to these collusive agreements, in exchange for kickbacks or other financial incentives, the Defendants steered the Prescribers and Clinic Controllers to direct large volumes of prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Defendants over a short period.

4.    As a result of their collusive kickback arrangements with the Prescribers and Clinic Controllers, the Defendants were able to submit an enormous volume of fraudulent billing – nearly three quarters of a million dollars – on just eight dates of service spread out over the course of only two months.   Specifically, from September 2022 through November 2022 the Defendants submitted over $748,762.00 in fraudulent claims to GEICO before abruptly ceasing operations in a calculated effort to evade detection by GEICO of the egregiously inflated and fraudulent charges.

5.    In furtherance of the scheme and to maximize profits, the Defendants intentionally targeted the Fraudulent Topical Pain Products to dispense to Insureds, in place of other effective but much-less costly prescription and non-prescription drug products, solely based on the medications' exorbitant pricing and high profit margins.  In fact, approximately 95% of the billing submitted through Lorraine Pharmacy was for Fraudulent Topical Pain Products and typically resulted in a charge of $1,888.00 per prescription for Diclofenac Sodium Gel 3% and $1,522.00 per prescription for Lidocaine 5% Ointment.

6.    In addition to Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment, the Defendants dispensed and billed for Lidothol 4.5-5% Patches ("Lidothol Patches") resulting in a charge to GEICO of $2,400.00 per box dispensed.  Notably, Lidothol Patches are classified as an "unapproved" drug by the United States Food and Drug Administration ("FDA").

7.    The Defendants' scheme not only inflated the charges submitted to GEICO and other insurers, but also posed serious risks to the patients' health, safety, and well-being.  In fact, Lorraine Pharmacy dispensed large volumes of the Fraudulent Pharmaceuticals to Insureds,

including multi-ingredient pain patches that are not FDA-approved and multiple pharmaceuticals from the same therapeutic class on the same date to the same Insureds, despite obvious clinical abuse and therapeutic duplication and, upon information and belief, operating without a supervising pharmacist in violation of law.

8.      By this action, GEICO seeks to recover more than $227,900.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to Lorraine Pharmacy of over $427,990.00 in pending fraudulent New York No-Fault claims that the Defendants submitted or caused to be submitted through Lorraine Pharmacy because:

(i)      Lorraine Pharmacy billed for pharmaceutical products that were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care;

(ii)     the Defendants participated in illegal, collusive relationships in which they steered Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Lorraine Pharmacy in exchange for unlawful kickbacks and other financial incentives;

(iii)    in order to exploit the reimbursement rates set forth by 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Lorraine Pharmacy dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals;

(iv)     Lorraine Pharmacy was operating without the supervision and management of a licensed pharmacist in violation of New York law; and

(v)      the Defendants made false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals through Lorraine Pharmacy pursuant to illegal, invalid, and duplicitous prescriptions.

9.      The Defendants' scheme began in 2022 and continues uninterrupted to the present day as the Defendants continue to pursue collection on their unpaid fraudulent claims against GEICO, as well as against other New York automobile insurers.

10.    As discussed more fully below, the Defendants at all times have known that: (i) the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which they steered the Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Lorraine Pharmacy in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants exploited the Pharmacy Fee Schedule by intentionally targeting a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and caused Lorraine Pharmacy to dispense to Insureds in large volumes at exorbitant charges, in place of other effective, less-costly pharmaceuticals; (iv) Lorraine Pharmacy was operating without the supervision and management of a licensed pharmacist in violation of New York law; and (v) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted claims for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions and continue to seek reimbursement on unpaid fraudulent claims.

11.    Based on the foregoing, the Defendants do not have any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.  The chart attached hereto as Exhibit "1" sets forth the fraudulent claims identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail seeking reimbursement under New York's No-fault law.  As a result of the Defendants' scheme, GEICO has incurred damages of approximately $225,862.00.

## THE PARTIES

### I.     Plaintiffs

12.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

13.     Defendant Lorraine Pharmacy is New York corporation incorporated on or about November 22, 2017 with its principal place of business at 72 Lorraine Street, Brooklyn, New York. Lorraine Pharmacy registered with the New York State Education Department Office of Professions ("NYSOP") on or about May 17, 2022.

14.     Lorraine Pharmacy knowingly submitted fraudulent claims to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

15.     Yakubov resides in and is a citizen of New York. Yakubov is the owner of record of Lorraine Pharmacy and not a licensed pharmacist.

16.     John Doe Defendants "1" – "5" reside in and are citizens of New York.  John Doe Defendants "1" – "5" include persons who are presently not identifiable but (i) who are associated with Yakubov and Lorraine Pharmacy and who conspired with them to further the fraudulent scheme committed against GEICO other New York automobile insurers; and (ii) laypersons associated with the No-Fault Clinics and who conspired with Yakubov and Lorraine Pharmacy to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

§1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive

of interest and costs, and is between citizens of different states.

18.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought

under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"]

Act) because they arise under the laws of the United States.

19.     In addition, this Court has supplemental jurisdiction over the subject matter of the

claims asserted in this action pursuant to 28 U.S.C. § 1367.

20.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern

District of New York is the District where one or more of the Defendants reside and because this

is the District where a substantial amount of the activities forming the basis of the Complaint

occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

21.     GEICO underwrites automobile insurance in the State of New York.

**I.     An Overview of New York's No-Fault Laws**

22.     New York's "No-Fault" laws are designed to ensure that injured victims of motor

vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that

they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y.

Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65

et seq.) (collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required

to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

23.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that

are incurred for health care goods and services.

24.    An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").   In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

25.    Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

26.    The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

27.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient.

28.    Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

II.    **An Overview of Applicable Licensing Laws**

29.    Pursuant to New York Education Law § 6808, no person, firm, corporation, or association shall possess drugs, prescriptions, or poisons for the purpose of compounding, dispensing, retailing, wholesaling, or manufacturing, or shall offer drugs, prescriptions, or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

30.    Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

31.    Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

32.    Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug

interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

33.    New York Education Law § 6810 prohibits pharmacies from dispensing when a prescription form for a drug includes any other drug.  Separate prescriptions are required for each drug prescribed and dispensed.

34.    New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

35.    New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

36.    New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

37.    New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

38.    Pursuant to New York Education Law § 6808(2)(c), "[t]he names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

39.     Pursuant to New York Education Law § 6808(e), every pharmacy shall be under the immediate supervision and management of a licensed pharmacist.

40.     Pursuant to New York Education Law § 6808(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

41.     Pursuant to New York Education Law § 6808(e), pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

42.     Pursuant to New York Education Law § 6808(h), "an application for registration as a pharmacy shall be over good moral character."

III.    **The Defendants' Fraudulent Scheme**

A.      **Overview of the Scheme**

43.     Beginning in 2022, and continuing uninterrupted through the present day, the Defendants implemented a fraudulent scheme in which they used Lorraine Pharmacy to exploit patients for financial gain by billing the New York automobile insurance industry for hundreds of thousands of dollars in exorbitant charges relating to Fraudulent Pharmaceuticals purportedly dispensed to Insureds.

44.     Lorraine Pharmacy purported to be a storefront neighborhood pharmacy operating in Brooklyn, New York, but really was nothing more than a front for a large-scale "quick-hit" fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals, while intentionally ignoring a vast array of prescription and over-the-counter medications readily available at a fraction of the cost.

45.     Unlike legitimate "community retail pharmacies", Lorraine Pharmacy appears to have operated as a pharmacy for only two months -- during which it dispensed and billed nearly three quarters of a million dollars in Fraudulent Pharmaceuticals in just eight days without any legitimate marketing or advertising efforts – and then operated only to the extent of collecting on the fraudulent billing.

46.     Unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, Lorraine Pharmacy's business targeted a limited set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) which accounted for the vast majority of the claims it submitted to GEICO. Specifically, approximately 95% of the claims submitted to GEICO by Lorraine Pharmacy were for Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment, which they acquired at low cost and used to submit egregiously inflated claims for reimbursement.

47.     The Office of the Inspector General of the U.S. Department of Health and Human Services noted that Diclofenac and Lidocaine have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing.  See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

48.     In addition to targeting the Fraudulent Topical Pain Products, Lorraine Pharmacy flouted New York pharmacy laws by operating without the supervision and management of a licensed pharmacist.  Upon information and belief, Lorraine Pharmacy dispensed and delivered the Fraudulent Topical Pain Products, as well as the other Fraudulent Pharmaceuticals, during a period when the only pharmacist on staff was not present and the pharmacy facility itself was closed.

49.     Despite operating without the supervision and management of a licensed pharmacist, Lorraine Pharmacy continued to fill prescriptions and deliver medications to Insureds,

all while the storefront location itself was closed, the shelves were completely bare, and its phone number was disconnected.

50.     In furtherance of the fraudulent scheme, the Defendants entered illegal, collusive agreements with the Prescribers and the Clinic Controllers and steered them to direct large volumes of medically unnecessary prescriptions to Lorraine Pharmacy for the targeted Fraudulent Topical Pain Products, under the guise of treating patients at various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (i.e., the No-Fault Clinics).

51.     Specifically, the Defendants paid unlawful kickbacks or provided other incentives to the Prescribers and Clinic Controllers associated with the No-Fault Clinics, and, in exchange, the Prescribers and Clinic Controllers prescribed or caused to be prescribed to Insureds specific prescription drugs with exorbitant profit margins (i.e., the Fraudulent Topical Pain Products) and routed those prescriptions to Lorraine Pharmacy.  This permitted the Defendants to submit egregious claims for reimbursement for the Fraudulent Topical Pain Products to GEICO.

52.     The prescriptions for the Fraudulent Topical Pain Products were typically based on generic, preprinted, and boilerplate examination reports meant to justify continuous, voluminous, excessive healthcare services, including prescriptions for pharmaceuticals, as part of predetermined protocols and collusive arrangements.  Further, the Fraudulent Topical Pain Products themselves often had no proven efficacy beyond what an over-the-counter equivalent could provide and were often duplicative of other medications contemporaneously prescribed and dispensed to the Insureds.

53.     The Defendants chose the Fraudulent Topical Pain Products because they knew that (i) similar over-the-counter drugs that could be recommended to Insureds are not covered expenses

under the No-Fault Laws and (ii) they could acquire the Fraudulent Topical Pain Products at low cost and submit claims for reimbursement under the No-Fault Laws at exorbitant prices.

54.     The collusive arrangements and predetermined treatment protocols are how the Defendants were able to bill GEICO alone over $748,762.00 in Fraudulent Pharmaceuticals in such a short period of time.  As GEICO comprises approximately one-third of the New York market, the projected amount of billing submitted to the New York No-Fault insurance industry likely exceeded $2 million in just two months.

55.     It is highly unlikely that any legitimate "community retail pharmacy" would be able to generate that much billing in just two months of operation and without any legitimate marketing or advertising efforts.  It is also highly unlikely that in the event a community pharmacy was able to legitimately generate that much billing in that short a time it would then abruptly cease operating such a profitable business.

56.     In keeping with the fact that the prescriptions were the byproducts of collusive arrangements and fraudulent treatment protocols, nearly 80% of the prescriptions routed to Lorraine Pharmacy originated, or purported to originate, from nine Prescribers associated with two different professional corporations – eight Prescribers associated with Atlantic Medical and Diagnostic, P.C. ("Atlantic Medical") and one Prescriber, John McGee, M.D. ("Dr. McGee"), associated with a professional corporation operating under his name, Integrated Medical Rehabilitation and Diagnostic, P.C. ("Integrated Medical").

57.     The Prescribers and the No-Fault Clinics from where they operated have been the subject of investigations and lawsuits commenced by various New York insurers regarding their fraudulent billing and treatment practices, and have been the source of excessive, fraudulent treatment and billing schemes aimed at generating profits without regard to patient care.

58.     Unlicensed laypersons, rather than the healthcare professionals working in the No-Fault Clinics, created and controlled the patient bases at the clinics, and dictated predetermined fraudulent treatment protocols used to maximize profits without regard to actual patient care.

59.     For example, eight of the Prescribers who directed prescriptions to Lorraine Pharmacy purportedly work for Jonathan Landow, M.D. ("Dr. Landow") through his professional corporation Atlantic Medical.  Dr. Landow and several of his professional corporation, including Atlantic Medical's predecessor – Macintosh Medical, P.C.  – were sued by GEICO for allegedly engaging in a multimillion-dollar fraud scheme involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements. Se. See Government Employees Ins. Co. et al v. Landow, et al, 1:21-cv-01440 (NGG)(RER)(E.D.N.Y. 2021).

60.     Dr. McGee and Integrated Medical have also been sued multiple times for engaging in no-fault insurance fraud schemes based on allegations that Dr. McGee performed medically unnecessary healthcare services and allowed unlicensed laypersons to illegally exercise ownership and control over Integrated Medical and use it to submit fraudulent claims to no-fault insurers. See State Farm Mutual Automobile Ins. Co. v. McGee et al., 1:10-cv-03848 (PKC)(RML) (E.D.N.Y. 2010); Allstate Ins. Co. et al. v. Ilyaich et al., 1:13-cv-05464 (NG)(LB) (E.D.N.Y. 2013); see also Allstate Ins. Co. et al. v. Rauch, D.C. et al., 2:22-cv-02424 (JMA)(LGD) (E.D.N.Y. 2022).

61.     To facilitate the steering of the large volumes of prescriptions for the targeted Fraudulent Pharmaceuticals to Lorraine Pharmacy, the Defendants arranged for the use of various forms of illegal, invalid, and duplicitous prescriptions that they used as a purported basis to

dispense large volumes of Fraudulent Pharmaceuticals in predetermined, protocol fashion without regard to genuine patient care.

62.    Upon information and belief, in many instances the prescriptions were not actually authorized by a licensed prescriber, but instead were "created" or "transmitted" electronically by the Clinic Controllers using the credentials of the Prescribers.  Indeed, in a number of instances, Lorraine Pharmacy billed for dispensing Fraudulent Pharmaceuticals to an Insured based on a prescription from a Prescriber, even though there is no evidence that the Insured underwent an examination with the Prescriber at all.

63.    In other instances, the Defendants dispensed the Fraudulent Pharmaceuticals in protocol fashion based on purported electronic prescriptions from a physician assistant that failed to conform with New York law in that they did not contain the name of the supervising physician – which is required on all prescriptions issued by a physician assistant – and which were not issued with the knowledge of, or any oversight by, a supervising physician.

64.    In further keeping with the fact that the Defendants illegally steered the Prescribers and Clinic Controllers at the No-Fault Clinics to provide the Lorraine Pharmacy with prescriptions for the Fraudulent Pharmaceuticals, Insureds were never given the option to use a pharmacy of their choosing.

65.    Instead, the Defendants colluded with the Prescribers and Clinic Controllers to ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to Lorraine Pharmacy, regardless of the distance of the pharmacy from the Insureds or the No-Fault Clinics where they were treating.

66.    The Defendants ensured that the Prescribers and Clinic Controllers directed the prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Defendants, regardless of: (i)

the distance of the Pharmacy Defendants to the Insureds' individual residences or the No-Fault Clinics where the Insureds were receiving treatment; and (ii) the fact that there were countless other pharmacies located much closer to the Insureds' individual residences and the No-Fault Clinics where they were receiving treatment.

67.    Notably, of the Insureds who purportedly received pharmaceuticals dispensed by Lorraine Pharmacy, more than 71% lived outside of Brooklyn, New York, where the pharmacy was located, with residences scattered mostly throughout Bronx, Manhattan, Westchester, Queens, and Long Island.

68.    On average, Insureds resided approximately 30 miles from Lorraine Pharmacy with an average door-to-door driving time of 50 minutes.

69.    In some instances, the Insureds' individual residences were located in states outside of New York, including in Connecticut and Pennsylvania.

70.    But for the Defendants' illegal, collusive financial agreements, the Insureds would not have received pharmaceutical products from a pharmacy located in a county outside of their individual places of residence, bypassing countless other pharmacies located much closer to the patients.

71.    The Prescribers and Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to Lorraine Pharmacy, notwithstanding its inconvenient location to the Insureds' individual residences because the prescriptions were being issued pursuant to illegal, collusive agreements between and among the Defendants, the Prescribers, and the Clinic Controllers.

72.    In most cases, Insureds received the Fraudulent Pharmaceuticals directly from the front desk staff at the various No-Fault Clinics despite the Defendants' representation that deliveries were mostly made to patients' homes.

73.     In some cases, the Insureds were not aware a Fraudulent Pharmaceutical dispensed by Lorraine Pharmacy was prescribed to them until the medication was delivered to them or distributed to them by the front desk staff.

74.     Insureds received multiple – sometimes up to as many as five – jars and tubes of Fraudulent Topical Pain Products at a time from the No-Fault Clinics' front desk staff and refills were dispensed automatically.

75.     The Defendants engaged in their pharmaceutical fraud scheme involving the Prescribers and the Clinic Controllers knowing that (i) the Fraudulent Pharmaceuticals were prescribed, dispensed, and billed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the Fraudulent Pharmaceuticals were the product of illegal, collusive arrangements intended to inflate the billing from the Lorraine Pharmacy to insurers and to financially enrich the Defendants; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and dispensed in large volumes to Insureds at inflated charges; (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of other prescription and over-the-counter medications proven to have therapeutic effects and available at a fraction of the cost; (v) Lorraine Pharmacy was operating without the supervision and management of a licensed pharmacist in violation of New York law; and (vi) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO in that they submitted fraudulent claims to GEICO for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions and continue to seek collection on unpaid fraudulent claims.

**B.** **The Fraudulent Pharmaceuticals Were Prescribed and Dispensed For Financial Gain and Without Genuine Regard for Patient Care**

76.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner.  Notwithstanding this basic goal, Insureds treated by the Prescribers at the No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from Lorraine Pharmacy – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

77.     Evidence-based best practices guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an oral non-steroidal anti-inflammatory drug ("NSAID") for the initial management of pain. Oral NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

78.     More recently, in 2019 the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report which focused on pain management and the treatment of acute and chronic pain.  According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education

and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate.  Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., oral NSAIDs) should be used as first line therapy for patients for whom medications are clinically appropriate.

79.     Notably, for a drug to alleviate pain it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

80.     Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated. For example – patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

81.     With respect to treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries), clinical studies of FDA-approved topical NSAIDs such as Diclofenac Sodium Gel 3% have shown that they are no more effective than a placebo.

82.     Despite these guidelines and the basic goal of helping patients recover in a timely fashion, the Prescribers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous, and excessive healthcare services that the healthcare providers at the various No-Fault Clinics purported to render to Insureds as part of a predetermined protocol which lacked any individualized treatment whatsoever. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products.

83.     Notwithstanding the creation of the examination reports, the Prescribers' prescriptions for the Fraudulent Pharmaceuticals dispensed by Lorraine Pharmacy were based on

predetermined protocols designed to exploit Insureds for financial gain, without regard to the genuine needs of the patients.

84.     In fact, to the extent any examination was performed at all, the Prescribers often (i) failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals; and/or (ii) inaccurately documented the patients' medical histories, including any current medications the patients were taking at the time of the examination.

85.     Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety as the Prescribers often did not know whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

86.     The Prescribers also did not document in their examination reports whether the patients were intolerant of oral medications necessitating a prescription for a Fraudulent Topical Pain Product dispensed by Lorraine Pharmacy.

87.     The Prescribers also continuously failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by Lorraine Pharmacy were actually used by the patient and, if so, whether they provided any pain relief or were otherwise effective for the purpose prescribed.

88.     At times, the Prescribers failed to document in any of their examination reports that the patient even received a Fraudulent Pharmaceutical.

      **i.**      **The Fraudulent Diclofenac and Lidocaine Ointment Prescriptions**

89.     In accordance with the fraudulent scheme discussed above, and despite the best practices outlined above, Lorraine Pharmacy primarily and routinely billed GEICO for exorbitantly priced Fraudulent Topical Pain Products, mostly in the form of Diclofenac Sodium

Gel 3% and Lidocaine 5% Ointment, pursuant to duplicitous prescriptions solicited from Prescribers and Clinic Controllers in exchange for kickbacks or other financial incentives.

90.    The Defendants solicited the Prescribers and the Clinic Controllers to provide Lorraine Pharmacy with voluminous prescriptions for Fraudulent Topical Pain Products because the Defendants could readily buy Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment at low cost and bill GEICO and other New York No-Fault insurers huge sums based on egregiously high wholesale prices.

91.    The Office of the Inspector General of the U.S. Department of Health and Human Services noted that Diclofenac and Lidocaine have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing.  See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

92.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the top few millimeters of skin.  Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

93.    Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

94.    Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment

should not exceed 5 grams. However, the Prescribing Providers virtually never indicated the maximum dosage on any prescriptions.

95.    Notably, Lidocaine ointments and patches with 4% Lidocaine are available over-the-counter and have a similar efficacy as Lidocaine 5% at a fraction of the cost.

96.    Over-the-counter products such as Icy Hot Lidocaine which contains 4% Lidocaine, are available at most well-known pharmacy retailers such as Rite-Aid and Target for advertised prices in the range of $10 or less.

97.    Despite this, the Prescribers never recommended Insureds first use over-the-counter lidocaine products to treat their minor aches and pains sustained in fender-bender type motor vehicle accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribers routinely prescribed Insureds Lidocaine 5% Ointment and directed the prescriptions to Lorraine Pharmacy which billed GEICO as much as $1,522.00 per prescription.

98.    In keeping with the fact that the Lidocaine 5% Ointment was prescribed and dispensed pursuant to collusive arrangements and predetermined protocols, the initial examination reports prepared by the Prescribers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions.

99.    Likewise, the follow-up examination reports often failed to address whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

100.    In addition to the egregious number of Lidocaine 5% Ointment prescriptions, the Defendants routinely submitted bills to GEICO through Lorraine Pharmacy seeking reimbursement for exorbitantly priced Diclofenac Sodium Gel 3%, pursuant to duplicitous

prescriptions solicited from Prescribers and Clinic Controllers in exchange for kickbacks or other financial incentives.

101.    As with the prescriptions for Lidocaine 5% Ointment, the Defendants solicited the Prescribers and the Clinic Controllers to provide them with voluminous prescriptions for Diclofenac Sodium Gel 3% because they could readily buy it at low cost and have Lorraine Pharmacy bill GEICO and other New York No-Fault insurers huge sums based on egregiously high wholesale prices.

102.    Lorraine Pharmacy typically billed GEICO $1,888.00 for each prescription of Diclofenac Sodium Gel 3% dispensed.

103.    Diclofenac Sodium Gel 3% is a topical NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet.  It has not been proven effective for treating strains or sprains.

104.    Diclofenac Sodium Gel 3% does not have any proven efficacy or safety in the treatment of musculoskeletal injuries such as sprains or strains, nor is the use of topical diclofenac to treat musculoskeletal injuries an accepted "off-label" use.

105.    Moreover, some clinical studies of topical NSAIDs have shown them to be no more effective than placebo for treating acute pain (e.g., pain from strains, sprains, contusions, or overuse injuries) in superficial locations.

106.    The United States Food and Drug Administration ("FDA") requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

107.    A "Black Box Warning" warning is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

108.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

109.    Notwithstanding the most common uses for Diclofenac Sodium Gel 3%, or the risks associated with the drug, the Defendants steered the Prescribers to prescribe Diclofenac Sodium Gel 3% while oftentimes recommending the patient continue the use of oral NSAIDs – such as ibuprofen, naproxen, and celecoxib – or simultaneously prescribing oral NSAIDs and other Fraudulent Topical Pain Products.

110.    Prescribing topical diclofenac, while simultaneously prescribing and dispensing oral NSAIDS to patients, is therapeutic duplication which results in increased risk with no additional therapeutic benefit.

111.    Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., naproxen and Diclofenac Sodium Gel 3%) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

112.    Each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur as a result of adverse drug reactions.  A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic

duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

113.    Nevertheless, the Prescribers and Clinic Controllers consciously prescribed or caused the prescription of Diclofenac Sodium Gel 3%, and the Defendants consciously dispensed Diclofenac Sodium Gel 3% in conjunction with oral NSAIDs and/or other Fraudulent Topical Pain Products to numerous Insureds, despite the risks it posed to the Insureds' health and well-being. For example:

    i.    Insured RJ was involved in a motor vehicle accident on September 24, 2022, and subsequently sought treatment with Youn Ju Lee, N.P. ("NP Y. Lee") of Proactive Medical Care, P.C. ("Proactive Medical"). On November 9, 2022, Lorraine Pharmacy dispensed Celebrex, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and cyclobenzaprine to RJ pursuant to prescriptions issued by Sujung Lee, N.P. ("NP S. Lee") on November 2, 2022.  It does not appear RJ underwent an examination with NP Y. Lee, NP S. Lee, or any other healthcare provider associated with Proactive Medical, on November 2, 2022.  Moreover, the simultaneous prescription of Celebrex and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

    ii.    Insured DH was involved in a motor vehicle accident on July 19, 2022, and subsequently sought treatment with Aleksandr Kopach, P.A. ("PA Kopach") with Atlantic Medical & Diagnostic, P.C. ("Atlantic Medical"). On November 9, 2022, Lorraine Pharmacy dispensed ibuprofen, Diclofenac Sodium Gel 3%, and Lidocaine 5% Ointment to DH pursuant to prescriptions issued by PA Kopach on October 26, 2022.  It does not appear that DH underwent an examination with PA Kopach, or any other healthcare provider associated with Atlantic Medical, on October 26, 2022.  Moreover, the simultaneous prescription of ibuprofen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

    iii.    Insured MP was involved in a motor vehicle accident on October 12, 2022, and subsequently sought treatment with PA Kopach of Atlantic Medical.  On November 9, 2022, Lorraine Pharmacy dispensed ibuprofen, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and cyclobenzaprine to MP pursuant to prescriptions issued by PA Kopach on October 24, 2022.  It does not appear that MP underwent an examination with PA Kopach, or any other healthcare provider associated with Atlantic Medical, on October 24, 2022.  Moreover, the simultaneous prescription of ibuprofen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

    iv.    Insured was involved in a motor vehicle accident on July 20, 2022, and subsequently sought treatment with Wei Hong Xu, N.P. ("NP Xu") of Atlantic

Medical.  On November 9, 2022, Lorraine Pharmacy dispensed celecoxib, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, tizanidine, and butalbital-acetaminophen-caffeine to JH pursuant to prescriptions issued by NP Xu on November 6, 2022.  It does not appear that JH underwent an examination with NP Xu, or any other healthcare provider associated with Atlantic Medical, on November 6, 2022.  Moreover, the simultaneous prescription of celecoxib and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

v.    Insured was involved in a motor vehicle accident on September 20, 2022, and subsequently sought treatment with PA Kopach of Atlantic Medical. On September 30, 2022, Lorraine Pharmacy dispensed ibuprofen, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and tizanidine to LG pursuant to prescriptions issued by PA Kopach on September 29, 2022. It does not appear that LG underwent an examination with PA Kopach, or any other healthcare provider associated with Atlantic Medical, on September 29, 2022.  Moreover, the simultaneous prescription of ibuprofen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication. On November 9, 2022, Lorraine Pharmacy dispensed ibuprofen, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and tizanidine to LG pursuant to prescriptions issued by PA Kopach on November 1, 2022.  Once again, the simultaneous prescription of ibuprofen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

vi.    Insured KM was involved in a motor vehicle accident on September 9, 2022, and subsequently sought treatment with PA Kopach of Atlantic Medical.  On October 11, 2022, Lorraine Pharmacy dispensed ibuprofen, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and cyclobenzaprine to KM pursuant to prescriptions issued by PA Kopach on October 4, 2022.  The simultaneous prescription of ibuprofen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

vii.    Insured TS was involved in a motor vehicle accident on September 20, 2022, and subsequently sought treatment with NP Xu of Atlantic Medical.  On November 9, 2022, Lorraine Pharmacy dispensed celecoxib, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and tizanidine to TS pursuant to prescriptions issued by NP Xu on November 1, 2022.  The simultaneous prescription of celecoxib and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

viii.    Insured JM was involved in a motor vehicle accident on August 16, 2022, and subsequently sought treatment with PA Kopach of Atlantic Medical.  On November 9, 2022, Lorraine Pharmacy dispensed naproxen, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and cyclobenzaprine to JM pursuant to prescriptions issued by PA Kopach on October 31, 2022. It does not appear that JM underwent an examination with PA Kopach, or any other healthcare provider associated with Atlantic Medical, on October 31, 2022.  Moreover, the simultaneous prescription of naproxen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

ix.    Insured SH was involved in a motor vehicle accident on September 5, 2022, and

subsequently sought treatment with PA Kopach of Atlantic Medical. On November 9, 2022, Lorraine Pharmacy dispensed ibuprofen, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and cyclobenzaprine to SH pursuant to prescriptions issued by PA Kopach on October 24, 2022. It does not appear that SH underwent an examination with PA Kopach, or any other healthcare provider associated with Atlantic Medical, on October 24, 2022. Moreover, the simultaneous prescription of ibuprofen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

x.    Insured EH was involved in a motor vehicle accident on October 29, 2022, and subsequently sought treatment with NP Xu of Atlantic Medical. On November 9, 2022, Lorraine Pharmacy dispensed celecoxib, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, butalbital-acetaminophen-caffeine, and tizanidine to EH pursuant to prescriptions issued by NP Xu on November 1, 2022. The simultaneous prescription of celecoxib and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

xi.    Insured PG was involved in a motor vehicle accident on September 11, 2022, and subsequently sought treatment with PA Kopach of Atlantic Medical. On October 11, 2022, Lorraine Pharmacy dispensed ibuprofen, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and cyclobenzaprine to PG pursuant to prescriptions issued by PA Kopach on October 7, 2022. It does not appear that PG underwent an examination with PA Kopach, or any other healthcare provider associated with Atlantic Medical, on October 7, 2022. Moreover, the simultaneous prescription of ibuprofen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

xii.    Insured JE was involved in a motor vehicle accident on September 23, 2022, and subsequently sought treatment with PA Kopach of Atlantic Medical. On October 30, 2022, Lorraine Pharmacy dispensed ibuprofen, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and cyclobenzaprine to JE pursuant to prescriptions issued by PA Kopach on October 24, 2022. It does not appear that JE underwent an examination with PA Kopach, or any other healthcare provider associated with Atlantic Medical, on October 24, 2022. Moreover, the simultaneous prescription of ibuprofen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

xiii.    Insured AB was involved in a motor vehicle accident on August 12, 2022, and subsequently sought treatment with PA Kopach of Atlantic Medical. On November 9, 2022, Lorraine Pharmacy dispensed ibuprofen, Diclofenac Sodium Gel 3%, and Lidocaine 5% Ointment to AB pursuant to prescriptions issued by PA Kopach on October 20, 2022. The simultaneous prescription of ibuprofen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

xiv.    Insured SS was involved in a motor vehicle accident on September 20, 2022, and subsequently sought treatment with PA Kopach of Atlantic Medical. On September 30, 2022, Lorraine Pharmacy dispensed ibuprofen, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and cyclobenzaprine to SS pursuant to prescriptions issued by PA Kopach on September 29, 2022. It does not appear that SS underwent

an examination with PA Kopach, or any other healthcare provider associated with Atlantic Medical, on September 29, 2022. Moreover, the simultaneous prescription of ibuprofen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication. On October 30, 2022, Lorraine Pharmacy again dispensed ibuprofen, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and cyclobenzaprine to SS pursuant to prescriptions issued by PA Kopach on October 27, 2022. Once again, the simultaneous prescription of ibuprofen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

xv.  Insured GA was involved in a motor vehicle accident on September 28, 2022, and subsequently sought treatment with PA Kopach of Atlantic Medical.  On October 11, 2022, Lorraine Pharmacy dispensed naproxen, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and baclofen to GA pursuant to prescriptions issued by PA Kopach on October 4, 2022. The simultaneous prescription of naproxen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication. On November 9, 2022, Lorraine Pharmacy again dispensed naproxen, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and baclofen to GA pursuant to prescriptions issued by PA Kopach on November 2, 2022. It does not appear that AG underwent an examination with PA Kopach, or any other healthcare provider associated with Atlantic Medical, on November 2, 2022. Once again, the simultaneous prescription of naproxen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

xvi.  Insured KB was involved in a motor vehicle accident on August 20, 2022, and subsequently sought treatment with PA Kopach of Atlantic Medical.  On October 30, 2022, Lorraine Pharmacy dispensed naproxen, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and cyclobenzaprine to KB pursuant to prescriptions issued by PA Kopach on October 24, 2022. It does not appear that KB underwent an examination with PA Kopach, or any other healthcare provider associated with Atlantic Medical, on October 24, 2022. Moreover, the simultaneous prescription of naproxen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

xvii.  Insured RD was involved in a motor vehicle accident on September 29, 2022, and subsequently sought treatment with PA Kopach of Atlantic Medical.  On October 30, 2022, Lorraine Pharmacy dispensed ibuprofen, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and cyclobenzaprine to RD pursuant to prescriptions issued by PA Kopach on October 24, 2022. It does not appear that RD underwent an examination with PA Kopach, or any other healthcare provider associated with Atlantic Medical, on October 24, 2022. Moreover, the simultaneous prescription of ibuprofen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

xviii.  Insured KD was involved in the same motor vehicle accident as Inured RD, supra, on September 29, 2022, and also sought treatment with PA Kopach of Atlantic Medical.  On October 30, 2022, Lorraine Pharmacy dispensed ibuprofen, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and cyclobenzaprine to KD pursuant to prescriptions issued by PA Kopach on October 24, 2022. It does not appear that KD underwent an examination with PA Kopach, or any other healthcare

provider associated with Atlantic Medical, on October 24, 2022. Moreover, the simultaneous prescription of ibuprofen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

xix.    Insured RV was involved in a motor vehicle accident on October 17, 2022, and subsequently sought treatment with PA Kopach of Atlantic Medical. On October 30, 2022, Lorraine Pharmacy dispensed naproxen, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and tizanidine to RV pursuant to prescriptions issued by PA Kopach on October 27, 2022. The simultaneous prescription of naproxen and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

xx.    Insured BS was involved in a motor vehicle accident on February 27, 2021, and subsequently sought treatment with NP Xu of Macintosh Medical, P.C. and its successor, Atlantic Medical. On October 30, 2022, Lorraine Pharmacy dispensed celecoxib, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, tizanidine, and butalbital-acetaminophen-caffeine to BS pursuant to prescriptions issued by NP Xu on October 25, 2022. The simultaneous prescription of celecoxib and Diclofenac Sodium Gel 3% constitutes therapeutic duplication.

114.    In the instant matter, by engaging in such therapeutic duplication, the Prescribers, Clinic Controllers, and Defendants put patients at increased risk of serious cardiovascular and gastrointestinal events (without any additional therapeutic benefit) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with topical diclofenac sodium.

115.    Diclofenac Sodium Gel 3% was prescribed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

116.    In keeping with the fact Diclofenac Sodium Gel 3% was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribers virtually never stated the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed Diclofenac Sodium Gel 3%.

117. The Prescribers' follow-up examination reports virtually never addressed whether the Diclofenac Sodium Gel 3% prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

118. Moreover, despite the fact the Defendants regularly dispensed multiple Fraudulent Pharmaceuticals to individual Insureds on the same dates of service, including pharmaceuticals from the same drug class (i.e., Diclofenac Sodium Gel 3% and oral NSAIDs), they virtually always submitted a separate delivery receipt for Diclofenac Sodium Gel 3% prescriptions.

119. The Defendants' egregious billing coupled with the fact that the Prescribers failed to properly document – or even document at all – the prescriptions for Lidocaine 5% Ointment and Diclofenac Sodium Gel 3%, or the Insureds' use of these medications, further indicates that there was no legitimate medical reason for the Prescribers to have prescribed large volumes of these medications to the Insureds, or for the Defendants to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects.

120. The Office of the Inspector General of the U.S. Department of Health and Human Services noted that Diclofenac and Lidocaine have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing.  See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

121. The Fraudulent Topical Pain Products were prescribed pursuant to collusive arrangements and predetermined treatment protocols and without regard for patient care and safety, or the commercial availability of a wide range of FDA approved medications with proven therapeutic effects available over-the-counter at a fraction of the cost.

122.    There is no legitimate medical reason for the Prescribing Providers to prescribe large volumes of the Fraudulent Topical Pain Products to Insureds, particularly given the availability of over-the-counter medications, and the legal requirements placed on pharmacists to conduct a prospective drug review before each prescription is dispensed. Such review shall include screening for potential drug therapy problems due to contraindications based on patient comorbidities, therapeutic drug duplication, drug-drug interactions, duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

123.    The Defendants typically billed GEICO between $1,522.00 for a single prescription of Lidocaine 5% Ointment and, to-date, have submitted over $356,700.00 in claims to GEICO seeking reimbursement for Lidocaine 5% Ointment.

124.    The Defendants typically billed GEICO between $1,888.00 for a single prescription of Diclofenac Sodium Gel 3% and, to-date, have submitted over $237,800.00 in claims to GEICO seeking reimbursement for Diclofenac Sodium Gel 3%.

125.    The Defendants' egregious billing coupled with the fact that the Prescribers often failed to properly document the Insureds' need for or use of these medications, further indicates that there was no legitimate medical reason for the Prescribers to have prescribed large volumes of these medications to the Insureds, or for the Defendants to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects.

### ii.    The Defendants Dispensed Pain Patches Not Approved by the FDA

126.    In keeping with the fact that the Defendants, Prescribers, and Clinic Controllers acted pursuant to fraudulent treatment protocols designed to maximize profits, and with gross indifference to patient care and safety, the Defendants also obtained prescriptions and submitted claims to GEICO for unapproved drugs produced or packaged by an unregistered supplier.

127.    The United States Federal Food, Drug, and Cosmetic Act ("FDCA") authorizes the United States Food and Drug Administration ("FDA") to oversee the safety of food, drugs, and cosmetics.

128.    The FDA strictly regulates over-the-counter and prescription drugs, and oversees drug manufacturing in several ways, including testing drugs and routinely inspecting drug manufacturing plants and outsourcing facilities engaged in the compounding of drugs.

129.    Lorraine Pharmacy, as a pharmacy licensed in New York State, is prohibited from holding for sale or selling drugs that are sourced from drug suppliers not licensed in New York, as there is no way to ensure that the drugs were manufactured in accordance with the good manufacturing practices specified in Parts 210 and 211 of Title 21, Code of Federal Regulations.

130.    Nevertheless, Lorraine Pharmacy billed GEICO tens of thousands of dollars for dispensing purported pharmaceutical pain patches to GEICO Insureds denominated as "Lidothol External Patch 4.5-5 MG" ("Lidothol Patches").

131.    The FDA considers Lidothol Patches to be unapproved drugs.

132.     Federal law requires all new drugs in the U.S. be shown to be safe and effective for their intended use prior to marketing.  Unapproved prescription drugs are only allowed to be marketed in limited circumstances, such as if the drug is subject to an open drug efficacy study or if health care professionals rely on the drug to treat serious medical conditions when there is no FDA-approved drug to treat that condition. See e.g., https://www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs.  No exception applies to the Lidothol Patches that might allow them to be marketed as prescription drug products.

133.    The FDA makes clear that unapproved drugs pose significant risks to patients because they have not been reviewed by the FDA for safety, effectiveness, or quality. Without

FDA review, there is no way to know if these drugs are safe and effective for their intended use, whether they are manufactured in a way that ensures consistent drug quality, or whether their label is complete and accurate.

134. All Lidothol Patches billed by the Defendants through Lorraine Pharmacy were purchased or sourced from Terrain Pharmaceuticals, LLC ("Terrain Pharmaceuticals").

135. Terrain Pharmaceuticals is not a registered drug supplier, manufacturer, or wholesaler with the New York State Education Department, as required by the pharmacy law, and therefore, is not legally permitted to dispense, retail, wholesale, manufacturer or offer drugs for sale.

136. Lorraine Pharmacy, as noted above, is prohibited from selling drugs that are purchased from drug suppliers not licensed in New York and from holding for sale or selling Lidothol Patches purchased from Terrain Pharmaceuticals.

137. To the extent that the Defendants somehow circumvented purchasing the Lidothol Patches directly from an unlicensed supplier, the patches remain "unapproved" drugs and no legitimate pharmacy owner would purchase and dispense as prescription drugs large volumes of unapproved drugs not reviewed by the FDA.

138. Similarly, no legitimate physician or healthcare provider would issue prescriptions for unapproved drugs like the Lidothol Patches, particularly since there are numerous other FDA-approved drugs available that the physician or healthcare provider could prescribe without any out the ordinary risk to the patient.

139. In short, the Defendants obtained prescriptions and dispensed and billed for "unapproved" drugs through Lorraine Pharmacy without any way to know if the drugs are safe and effective, manufactured in a way that ensured consistent drug quality, or contained complete

and accurate labelling – solely to exploit the patients for financial gain, without regard for genuine patient care.

140.    In keeping with the fact that the Lidothol Patches were prescribed and dispensed without regard for patient care and solely for financial gain, the initial examination reports prepared by the Prescribers virtually never set forth the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed a Lidothol Patch. Likewise, the follow-up examination reports virtually never addressed whether the Lidothol Patches prescribed provided any pain relief to the patient or were otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

141.    Defendants' billing to GEICO for the Lidothol Patches typically resulted in charges of $2,400.00 per prescription and, to-date, Defendants have submitted over $40,000.00 in billing for these Fraudulent Topical Pain Products.

### C.    The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among the Defendants, Prescribers, and Clinic Controllers

142.    To effectuate the fraudulent scheme, the Defendants steered the Prescribers and Clinic Controllers to routinely prescribe and direct prescriptions to Lorraine Pharmacy for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

143.    New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

144.    Here, Defendants colluded with Prescribers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and direct those prescriptions to Lorraine Pharmacy so that they could bill GEICO huge sums.

145.    In furtherance of the scheme, the Prescribers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to the collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

146.    The Prescribers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; that the Fraudulent Pharmaceuticals were prescribed and dispensed without any attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost; and Lorraine Pharmacy was operating without the supervision and management of a licensed pharmacist.

147.    The Defendants, in collusion with the Prescribers and Clinic Controllers, made sure that the Insureds never had the option to use a pharmacy of their choosing, and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to Lorraine Pharmacy notwithstanding that (i) in most instances the No-Fault Clinics and the patients themselves were located in counties far from Lorraine Pharmacy and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

148.    The Defendants purported to mail or deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, without the patient ever seeing the actual written prescription and, in many cases, without the patient even knowing that they were to receive a Fraudulent Pharmaceutical.

149.    More often, however, the Insureds were given the Fraudulent Pharmaceuticals dispensed by Lorraine Pharmacy directly from the front desk staff at the various No-Fault Clinics, again without ever seeing the actual prescription or, in many cases, not even knowing that they were to receive a Fraudulent Pharmaceutical.

150.    The Defendants, Prescribers, and Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by Lorraine Pharmacy, and to ensure that the Defendants benefitted financially from the prescriptions.

151.    The Prescribers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

152.    The Prescribers and Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to Lorraine Pharmacy rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

153.    The Defendants, Prescribers, and Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to Lorraine Pharmacy, unless they profited from their participation in the illegal scheme.

154.    But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribers would not have prescribed the Fraudulent Topical Pain Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribers and Clinic Controllers would not have directed the prescriptions to Lorraine Pharmacy.

155.    The Defendants, Prescribers, and Clinic Controllers affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

156.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribers and Clinic Controllers received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by Lorraine Pharmacy.

157.    Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued.

**D.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

158.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of

the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

159.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

160.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

161.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

162.    The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive "average wholesale prices," in order to inflate the billing submitted through Lorraine Pharmacy and to maximize their profits.

163.    In support of its charges, Lorraine Pharmacy typically submitted: (i) printouts of Lorraine Pharmacy's electronic prescription records; (ii) a HCFA 1500 Form which included the purported NDC numbers, units, and corresponding charges for each drug product; (iii) a delivery receipt; and (iv) an executed assignment of benefits forms.  At times, the Defendants also submitted an examination report prepared by the Prescriber – or another healthcare professional associated with the same medical practice as the Prescriber – though the examination was not always performed on the date the prescription was issued.

164.   The NDC numbers listed on the NF-3 and HCFA 1500 Forms submitted by the Defendants through Lorraine Pharmacy are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

165.   The Defendants never submitted to GEICO their wholesale purchase invoices demonstrating how much the Defendants actually paid the supplier for the Fraudulent Topical Pain Products.

166.   The Defendants never submitted to GEICO any documents evidencing whether the Defendants actually purchased topical pain products with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

167.   In fact, the Defendants never actually paid the targeted, expensive "average wholesale price" of the Fraudulent Topical Pain Products that they dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for the Fraudulent Topical Pain Products.

168.   The Defendants paid only a fraction of the "average wholesale price" of the Fraudulent Topical Pain Products that the Defendants targeted to use in connection with the billing submitted through Lorraine Pharmacy, but nevertheless billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of an array of other FDA approved, proven effective medications or commercially available over-the-counter products.

**IV.    The Defendants' Submission to GEICO of Fraudulent NF-3 and HCFA 1500 Forms**

169.   To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits consistently have been submitted to GEICO by and on behalf of Lorraine Pharmacy seeking payment for pharmaceuticals for which they are ineligible to receive.

170.    These forms, including NF-3 Forms, HCFA-1500 Forms, and other supporting records that the Defendants submitted or cause to be submitted to GEICO, were false and misleading in the following material respects:

i.      The NF-3 Forms, HCFA-1500 Forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

ii.     The NF-3 Forms, HCFA-1500 Forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribers and Clinic Controllers in order to steer voluminous and illegal prescriptions to Lorraine Pharmacy for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives;

iii.    The NF-3 Forms, HCFA-1500 Forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that they dispensed and billed for Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions;

iv.     The NF-3 Forms, HCFA-1500 Forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and,

v.      The NF-3 Forms, HCFA-1500 Forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in

compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants operated Lorraine Pharmacy without the supervision and guidance of a licensed pharmacist in violation of New York Law.

## V.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

171.    The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

172.    To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

173.    Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for medical necessity and genuine patient care; (ii) the Defendants were involved in collusive kickback arrangements with the Prescribers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing submitted to GEICO and other New York insurance companies; and (iii) Lorraine Pharmacy was operating without the supervision and management of a licensed pharmacist.

174.    The Defendants also caused billing to be submitted by through Lorraine Pharmacy for only a brief period of time in order to collect as much reimbursement as possible on their fraudulent claims, as quickly as possible, and to prevent discovery of the fraudulent scheme.

175.    The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

176.    The Defendants have hired law firms to pursue collection from GEICO and other insurers of the fraudulent charges submitted through Lorraine Pharmacy. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, the Defendants continue to have legal counsel pursue individual collection actions against GEICO and other insurers without regard for the fact Lorraine Pharmacy was engaged in fraud.

177.    The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since the Defendants know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

178.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $225,862.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants.

179.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## THE FIRST CLAIM FOR RELIEF
### Against All Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

180.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

181.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $427,990.00 in fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted, or caused to be submitted, to GEICO through Lorraine Pharmacy.

182.    Lorraine Pharmacy has no right to receive payment for any pending bills submitted to GEICO because it billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed solely for financial gain, without regard for genuine patient care.

183.    Lorraine Pharmacy has no right to receive payment for any pending bills submitted to GEICO because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Lorraine Pharmacy in exchange for unlawful kickbacks and other financial incentives.

184.    Lorraine Pharmacy has no right to receive payment for any pending bills submitted to GEICO because the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Lorraine Pharmacy dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

185.    Lorraine Pharmacy has no right to receive payment for any pending bills submitted to GEICO because the Defendants made and continue to make false and fraudulent

misrepresentations to GEICO in that they submitted fraudulent claims to GEICO for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions.

186.    Lorraine Pharmacy has no right to receive payment for any pending bills submitted to GEICO because it operated without the supervision and management of a licensed pharmacist in violation of New York law.

187.    The Defendants, including the Pharmacy Defendants, violated New York State regulatory and licensing requirements, rendering the pharmacy ineligible to receive reimbursement for No-Fault Benefits.

188.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Lorraine Pharmacy has no right to receive payment for any pending bills submitted to GEICO.

**THE SECOND CLAIM FOR RELIEF**
**Against R. Yakubov and John Doe Defendants "1" – "5"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

189.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

190.    Lorraine Pharmacy is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

191.    R. Yakubov and John Doe Defendants "1" – "5" knowingly have conducted and/or participated, directly or indirectly, in the conduct of Lorraine Pharmacy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis, and continuous efforts to collect on those charges to the present, seeking payments that Lorraine Pharmacy was not eligible to receive under the No-

Fault Laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Lorraine Pharmacy in exchange for unlawful kickbacks and other financial incentives; (iii) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions; (iv) the Defendants intentionally targeted a specific set of pharmaceutical products that that they acquired at low cost and had Lorraine Pharmacy dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law; and (v) the Defendants operated Lorraine Pharmacy without the supervision and management of a licensed pharmacists in violation of New York law. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

192. Lorraine Pharmacy's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which R. Yakubov and John Doe Defendants "1" – "5" operated Lorraine Pharmacy, inasmuch as Lorraine Pharmacy never were eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Lorraine Pharmacy to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Loraine Pharmacy to the present day.

193.    Lorraine Pharmacy is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants.  These inherently unlawful acts are taken by Lorraine Pharmacy in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

194.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $227,900.00 pursuant to the fraudulent bills submitted by the Defendants through Lorraine Pharmacy.

195.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THE THIRD CLAIM FOR RELIEF
**Against R. Yakubov and John Doe Defendants "1" – "5"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

196.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

197.    Lorraine Pharmacy is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

198.    R. Yakubov and John Doe Defendants "1" – "5" are employed by and/or associated with Lorraine Pharmacy.

199.    R. Yakubov and John Doe Defendants "1" – "5" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Lorraine Pharmacy's affairs, through a pattern of racketeering activity consisting of repeated violations of

the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis, and continuous efforts to collect on those charges to the present, seeking payments that Lorraine Pharmacy was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Lorraine Pharmacy in exchange for unlawful kickbacks and other financial incentives; (iii) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions; (iv) the Defendants intentionally targeted a specific set of pharmaceutical products that that they acquired at low cost and had Lorraine Pharmacy dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law; and (v) the Defendants operated Lorraine Pharmacy without the supervision and management of a licensed pharmacists in violation of New York law.  The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

200.    R. Yakubov and John Doe Defendants "1" – "5" knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO and by continuing to seek collection of those fraudulent charges.

201.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $227,900.00 pursuant to the fraudulent bills submitted by the Defendants through Lorraine Pharmacy.

202.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THE FOURTH CLAIM FOR RELIEF
**Against All Defendants**
**(Common Law Fraud)**

203.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

204.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Lorraine Pharmacy.

205.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Lorraine Pharmacy acted in accordance with material licensing requirements and is therefore eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct illegal

prescriptions for the Fraudulent Pharmaceuticals to Lorraine Pharmacy in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that Lorraine Pharmacy acted in accordance with material licensing requirements and is therefore eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, and duplicitous prescriptions;  (iv) in every claim, the representation that Lorraine Pharmacy acted in accordance with material licensing requirements and is therefore eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law; and (v) in every claim, the representation that Lorraine Pharmacy acted accordance with material licensing requirements and, therefore, is eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact Lorraine Pharmacy operated without the supervision and management of a licensed pharmacists in violation of New York law.

206.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Lorraine Pharmacy that were not compensable under the No-Fault Laws.

207.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $227,900.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Lorraine Pharmacy.

208.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

209.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE FIFTH CLAIM FOR RELIEF
### Against All Defendants
### (Unjust Enrichment)

210.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

211.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

212.     When GEICO paid the bills and charges submitted by or on behalf of Lorraine Pharmacy for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

213.     The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

214.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

215.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $227,900.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Claim for Relief against all Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Lorraine Pharmacy has no right to receive payment for any pending bills, amounting to approximately $427,990.00 in charges submitted to GEICO;

B.      On the Second Claim For Relief against Defendants R. Yakubov and John Doe Defendants "1" – "5", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $227,900.00, together with together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

C.      On the Third Claim For Relief against Defendants R. Yakubov and John Doe Defendants "1" – "5", compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $227,900.00 together with together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.      On the Fourth Claim For Relief against all Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $227,900.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

E.      On the Fifth Claim For Relief against all Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $227,900.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
        November 14, 2023

                                        RIVKIN RADLER LLP

                                        By:    /s/ *Michael A. Sirignano, Esq.*
                                                Michael A. Sirignano

Barry I. Levy
Priscilla D. Kam

926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*